**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GAYNELL TIMMS             )
                             )
      Plaintiff,        )  No. 09 C 1416
                             )
        v.             )  Magistrate Judge Arlander Keys
                             )
MICHAEL J. ASTRUE, Commissioner )
of Social Security         )
                             )
      Defendant.        )

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Gaynell Timms, moves this Court for summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner"), who denied her claim for Social Security Disability Insurance Benefits ("DIB"). The Commissioner has filed a cross-motion for summary judgment seeking affirmance of his decision.

**PROCEDURAL HISTORY**

Gaynell Timms applied for DIB on June 29, 2004, alleging a disability onset date of December 30, 2003. R. at 861. The Social Security Administration ("SSA") initially denied her claim on March 3, 2005, and upon reconsideration on July 18, 2005. R. at 861. Ms. Timms then requested a hearing, which was held on July 10, 2006. R. at 861. From that hearing, Administrative Law Judge Cynthia Bretthauer ("ALJ") issued a partially favorable

GAYNELL TIMMS                          )
                                       )
    Plaintiff,     ) No. 09 C 1416
                                       )
      v.  ) Magistrate Judge Arlander Keys
                                       )
MICHAEL J. ASTRUE, Commissioner        )
of Social Security                     )
                                       )
    Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gaynell Timms, moves this Court for summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner"), who denied her claim for Social Security Disability Insurance Benefits ("DIB"). The Commissioner has filed a cross-motion for summary judgment seeking affirmance of his decision.

### PROCEDURAL HISTORY

Gaynell Timms applied for DIB on June 29, 2004, alleging a disability onset date of December 30, 2003. R. at 861. The Social Security Administration ("SSA") initially denied her claim on March 3, 2005, and upon reconsideration on July 18, 2005. R. at 861. Ms. Timms then requested a hearing, which was held on July 10, 2006. R. at 861. From that hearing, Administrative Law Judge Cynthia Bretthauer ("ALJ") issued a partially favorable

decision on July 25, 2006, finding Ms. Timms disabled under the Social Security Act as of April 9, 2006. Ms. Timms appealed the decision, and the Appeals Council remanded the issue back to ALJ Bretthauer to give further consideration to treating source opinions, a medical expert opinion, the claimant's residual functional capacity, and to obtain supplemental evidence from a vocational expert. R. at 19. Plaintiff's hearing on remand was held before ALJ Bretthauer on December 17, 2007. R. at 19. The ALJ issued a decision on January 25, 2008, granting benefits to Plaintiff after her fiftieth birthday on April 9, 2006, and denying benefits before that date. R. at 30. The ALJ found that prior to Ms. Timms' fiftieth birthday, she could perform a significant number of jobs that existed within the economy, including positions as a sorter and bench assembler. R. at 29. The ALJ's decision became the final agency decision on January 7, 2009, when the Appeals Council denied Ms. Timms' Request for Review. R. at 6-8.

Ms. Timms filed this lawsuit on March 5, 2009, seeking review of the Agency's decision and an award of disability income beginning December 30, 2003. Compl. at 2. The case was initially assigned to Judge William J. Hibbler in the Northern District of Illinois. The parties consented to proceed before this Court, and the matter was reassigned to this Court on February 2, 2010. Both parties moved for summary judgment. Ms.

Timms asks the Court to vacate the ALJ's decision and either reverse or remand the case for further proceedings, and the Commissioner asks that the decision be affirmed.

## FACTUAL BACKGROUND

### *Testimony at Hearing*

At the hearing on December 17, 2007, the ALJ heard from Plaintiff Gaynell Timms, Vocational Expert ["VE"] William Newman, and Medical Expert ["ME"] Dr. Ronald Semerdjian. R. at 814-15.

### A. *Testimony of Plaintiff*

Ms. Timms testified that she has trouble hearing and cannot understand the majority of what other people say to her without being able to read their lips, even if the person is standing only seven to eight feet from her. R. at 818. Ms. Timms owns hearing aids, but was not wearing them at the time of the hearing. R. at 818. She testified that the hearing aids only assist her by alerting her that someone is speaking to her, but do not enhance her ability to understand what was said. R. at 818. In addition, Ms. Timms was recently diagnosed with glaucoma. R. at 829. She does not have a driver's license as her hearing and sight keep her from driving. R. at 830.

Ms. Timms testified that she either uses her cane while walking or supports herself with a wall or other object because of her knee problems. R. at 820. She stated that she can stand

3

for 20 to 25 minutes at a time. R. at 820. Similarly, Ms. Timms cannot sit for more than 30 to 40 minutes before she must reposition herself or put her legs up to take pressure off her knee. R. at 821.

In September 2005, Dr. Garelick operated on Ms. Timms' knee to assist with arthritis and a ligament issue. R. at 819, 821. Ms. Timms returned to Dr. Garelick with continued complaints of knee pain and has received steroid shots. R. at 819. She was supposed to return again to Dr. Garelick in June 2007, but could not make it, because she ended up in the hospital with "severe chest pain." R. at 819. At that time, Ms. Timms had her gallbladder removed to remedy a gallstone problem. R. at 819. Ms. Timms testified that she expected to return to her knee doctor in January 2008 and anticipated needing a knee replacement. R. at 819.

Ms. Timms testified that she has had a defibrillator since 2004. R. at 822. She noted that, from the time her pacemaker was implanted through 2007, she experienced intermittent electronic shocks up to six times per day. R. at 825-26. The shocks made her "jerk around" and caused her to be exhausted afterward. R. at 826. She testified that these shocking episodes prevented her from doing anything besides sitting or walking around until the pain dissipated. R. at 827.

Ms. Timms further testified that she suffers from diabetes.

R. at 827. The diabetes makes her "sick" three to four days per week. R. at 827. This sickness is characterized by constant sweating and "uncontrollable sleep," sometimes resulting in her vomiting. R. at 827. Ms. Timms takes 2,000 mg of metformin daily to combat her diabetes; however, the side effects from that medicine and her other medicines cause her additional problems. R. at 827. Specifically, she suffers from drowsiness, upset stomach, and headaches daily. R. at 828. Ms. Timms stated that, because of her condition and her medication, she uses the restroom very often; she must urinate around fifteen times per day and has three to four bowel movements per day, predominantly diarrhea. R. at 828.

Ms. Timms believed she could lift 20 to 25 pounds, approximately three to four times. R. at 831. Ms. Timms was capable of lifting a gallon of milk and her grandchildren, but had not attempted any lifting above 20 to 25 pounds recently. R. at 831.

B. *Testimony of Vocational Expert*

At the hearing, VE William Newman characterized Ms. Timms' warehouse work as heavy and semiskilled; her childcare-bus driver work as medium and semiskilled; her assisted independent living center coordinator work as light and semi-skilled; her separate living coordinator position as light and skilled; and her credit counselor work as sedentary and skilled. R. at 850-51.

The ALJ asked Mr. Newman about a hypothetical 47 to 51 year-old individual with the work experience and education of Ms. Timms, who could sit for six to eight hours per day or stand and walk for six to eight hours per day, with the ability to sit and stand every 30 to 60 minutes; who could lift 10 pounds frequently or 20 pounds occasionally; who must avoid concentrated exposure to pulmonary irritants; and who needed to avoid constant background noise as well as frequent communication with others. R. at 851. Mr. Newman testified that the hypothetical individual could not perform any of Ms. Timms' relevant past work. R. at 852. However, other positions in the economy were available to Ms. Timms, including: (1) sorter, which is unskilled and sedentary with 12,840 positions in the Chicago area, and (2) bench assembler, which is unskilled and sedentary with 43,881 positions in the Chicago area. R. at 852. The attorney asked Mr. Newman whether the same individual could perform those jobs if she needed to walk around for three to five minutes every half hour or was subjected to pacemaker shocks in the same interval, to which Mr. Newman replied that she could not. R. at 852.

C. *Testimony of Medical Expert*

Dr. Semerdjian testified that he could objectively identify the sum of Ms. Timms' impairments since her onset date of December 30, 2003; however, he could not speak to the specifics

of her knee problems, because evidence of her operation and knee flexibility had not been provided to the SSA. R. at 833.

Dr. Semerdjian noted that Ms. Timms had a pacemaker, not a defibrillator. R. at 833. As to the pacemaker, Dr. Semerdjian testified that the shocks felt by Ms. Timms were the result of the pacemaker effectively stimulating her atria and ventricle. R. at 834. Ms. Timms underwent a nuclear stress test in June of 2007; her echocardiogram and electrocardiogram on June 11, 2007 were both within the normal range. R. at 834. Ms. Timms' heart block also appeared to be intermittent, as opposed to permanent, so that the shocks she felt were likely only an "intermittent phenomenon." R. at 834. According to Dr. Semerdjian, Ms. Timms' last internal medicine consultation occurred in January of 2005, when her doctor indicated that the pacemaker was working well. R. at 834. During that consultation, she had a blood test for heart failure and a chest x-ray, which both showed normal results. R. at 834. Based on his analysis, Dr. Semerdjian indicated that there was no evidence of heart failure and that Ms. Timms' cardiac status was stable. R. at 834, 841.

Regarding Ms. Timms' diabetes, Dr. Semerdjian identified no evidence from Ms. Timms' ophthalmologic exams that would indicate a proliferated retinitis, peripheral neuropathy, or recurrent acidosis; the results of her exams appeared normal. R. at 835. Dr. Semerdjian stated that the medical evidence lacked sufficient

information to permit comment on Ms. Timms' varying blood sugar levels. R. at 835. Similarly, while Ms. Timms' asthma had been noted on a couple of occasions, there was a lack of evidence of recurrent hospitalizations, which could not be confirmed from the information available. R. at 835. Dr. Semerdjian also stated that Ms. Timms' glaucoma did not qualify as an impairment, because the condition is treatable. R. at 835.

Dr. Semerdjian reviewed Ms. Timms' January 2005 internal medicine consultation in order to comment on her knee pain. R. at 835-36. As of that examination, Ms. Timms had normal range of motion in her knees, could walk on her toes and heels, and presented no significant impairment. R. at 836. No evidence of Ms. Timms' knee operation had been provided for the proceedings, so Dr. Semerdjian was unable to comment on her arthroscopy or subsequent follow-up examinations. R. at 836.

Dr. Semerdjian also testified that Ms. Timms had no apparent impairment in her hand. R. at 836. Dr. Semerdjian acknowledged that Ms. Timms suffered a chip fracture in her wrist many years prior, but did not believe the injury could have caused any hand impairment at the time of the hearing. R. at 836. Similarly, while it was possible that carpal tunnel syndrome could have been developing, the only evidence that Ms. Timms had been examined came from a January 1991 electromyogram containing almost no objective evidence of its results. R. at 836.

8

An audiogram from 1984 confirmed that Ms. Timms suffered from hearing loss. R. at 837. She had not undergone any subsequent audiograms since receiving hearing aids, but the available information satisfied her hearing deficit for higher pitches. R. at 837. Dr. Semerdjian also testified that Ms. Timms suffered from hypertension. R. at 837.

Dr. Semerdjian testified that none of Ms. Timms' ailments or conditions met the required impairment levels after her alleged onset date of December 30, 2003. R. at 837. Dr. Semerdjian noted, however, that Ms. Timms is subject to occupational limitations. R. at 837-38. Ms. Timms' hearing restricts her from working in an environment with "a lot of background noise" or communicating frequently with others. R. at 838. Ms. Timms' asthma further prevents her from working in an environment with fumes, dust, or particulate matter. R. at 839. Her pacemaker restricts her from engaging in sustained vigorous physical activity, such that Ms. Timms could lift twenty pounds occasionally or ten pounds frequently. R. at 838. Furthermore, Ms. Timms could not stand or walk around for a full eight hours, but would require a combination of sitting and standing. R. at 842.

Dr. Semerdjian acknowledged that his opinion differed from some of Ms. Timms' prior treating physicians, who had opined that she was unable to work. R. at 839. Dr. Semerdjian testified that

he had seen the notes from the treating physicians "who indicated that she couldn't work but [he'd] like to see reasons for them saying so." R. at 839. The treating physicians provided insufficient bases for their conclusion, according to Dr. Semerdjian. R. at 839.

### Medical Evidence

*A. Treating Physicians*

Ms. Timms produced medical evidence from five treating physicians: Dr. David Ebert, Dr. Atul Trivedi, Dr. Mark Ovadia, Dr. Shirin Muzaffam, and Dr. Aziz Ahmed. She also provided evidence of her visits to Mt. Sinai Hospital Medical Center and Access Community Health Network between 2005 and 2007.

On June 2, 2004, Ms. Timms made an emergency room visit to Mt. Sinai Hospital, complaining of chest pains and tightness. R. at 157, 209. The treating physician, Dr. Atul Trivedi, diagnosed Ms. Timms with third degree heart block and two days later, on June 4, 2004, Ms. Timms had a pacemaker implanted to monitor her heart. R. at 209. Dr. Trivedi noted the patient's history of asthma and carpal tunnel syndrome. R. at 208.

Dr. David Ebert was Ms. Timms' primary treating physician; Dr. Ebert worked out of Mount Sinai Hospital and the Access Community Health Network. On August 26, 2004, Dr. Ebert handwrote a statement summarizing Ms. Timms' health issues,

concluding that she had been "unable to work for over 4-6 months, and is unable to work for 6 months or more farther [sic]." R. at 207. Dr. Ebert's handwritten statement acknowledged that Ms. Timms suffers from a severe irregular heartbeat, for which she had a pacemaker placed on June 4, 2004, that she has arthritis in her knees that limits her ability to stand or walk, that she has respiratory problems that cause shortness of breath, and that she has severe hearing loss. R. at 207.

Dr. Ebert also responded to a questionnaire from the Illinois Department of Human Services on October 15, 2004. R. at 202. Dr. Ebert noted that, in addition to the third degree heart block requiring a pacemaker, Ms. Timms suffered from arthritis in the knees and asthma, with attacks occurring two to six times per month, lasting up to one day, and occasionally requiring emergency hospital visits. R. at 202. Based on her heart condition, asthma, knee arthritis, and hearing loss, Dr. Ebert reiterated that Ms. Timms was unable to work and was still receiving active evaluation for her heart condition. R. at 202.

Dr. Marc Ovadia completed a follow-up exam of Ms. Timms, after her urgent visit to Mt. Sinai Hospital on October 20, 2004. R. at 205. Dr. Ovadia opined that Ms. Timms suffered from the bradycardia-tachycardia variant of sick sinus syndrome, with observation of atrial fibrillation, which is a type of irregular heartbeat. R. at 205. Her heart condition had been causing her

11

shortness of breath.  R. at 205.  Dr. Ovadia recommended that Ms. Timms continue conservative treatment of her heart with prescribed medication.  R. at 697-98.

Ms. Timms visited Dr. Shirin Muzaffam for her asthma problems.  Dr. Muzaffam provided a respiratory report to the Bureau of Disability Determination Services on October 8, 2004. R. at 211.  Dr. Muzaffam noted that Ms. Timms began suffering from asthma in 1997.  R. at 211.  Ms. Timms provided evidence of emergency room visits for asthma in February 2003, R. at 276-77, on June 9, 2003, R. at 161-73, and other asthma treatment prior to 2000, R. at 405-414.  In Dr. Muzaffam's respiratory report, he noted that Ms. Timms' last examination was on September 1, 2004. R. at 211.  At that time, Ms. Timms was still diagnosed with asthma; however, her breathing and chest x-ray were normal.  R. at 211.  Ms. Timms was suffering from asthmatic attacks two to three times per week, each lasting two to three hours.  R. at 212.  Although Ms. Timms' asthma had not required hospitalizations, she had been administered intravenous steroids and B-antagonists at her emergency room visits.  R. at 212.  Dr. Muzaffam noted that Ms. Timms was taking medication, including an inhaler, to treat her asthma and that her treatment response was "fair."  R. at 212.  Based on her asthma, in addition to the sick sinus syndrome, heart block, and pacemaker, Dr. Muzaffam believed that Ms. Timms could perform "light physical activity," and noted

that Ms. Timms suffered shortness of breath from walking half a block. R. at 212.

Ms. Timms made multiple visits to the Access Community Health Network ("ACHN") in 2004 and 2005. On July 12, 2004, Ms. Timms visited with complaints of knee pain. R. at 662. On March 7, 2005, Ms. Timms' visit was for chest pains and shaking and sweating. R. at 646. On November 11, 2005, Ms. Timms sought treatment for chest pain and diabetes follow-ups, head pain, and blurry eyes. R. at 630.

Ms. Timms underwent arthroscopic surgery on her right knee on September 6, 2005. R. at 26, 588. Upon discharge, Ms. Timms was instructed to keep her knee elevated and to avoid weight-bearing for 24 to 48 hours. R. at 26, 588. Ms. Timms had no follow-up evaluations on her knee. R. at 26. Dr. Ebert noted on a subsequent progress visit that Ms. Timms had arthritis in her knees, left more than right, with swelling, which required her to use a cane. R. at 282.

On February 16, 2007, Dr. Aziz Ahmed performed a left heart catheterization, selective coronary and angiography, and left ventriculography on Ms. Timms at Mt. Sinai Hospital. R. at 792-793. Dr. Ahmed opined that Ms. Timms had non-obstructive coronary artery disease, normal left ventricular function; he recommended medical management to treat the conditions. R. at 792-793.

In compliance with her medical management directions, Ms. Timms visited Dr. Ovadia for an evaluation on March 14, 2007. R. at 789-91. Ms. Timms complained of new onset symptoms, including chest pain, frontal headaches with blurred vision, dizziness, and "fluid buildup." R. at 789-91. Dr. Ovadia reiterated his diagnosis of Ms. Timms' transient complete heart block with a pacemaker implanted June 2004, partial deafness, sick sinus syndrome, transient AV block with a history of atrial fibrillation, diabetes, glaucoma, and asthma. R. at 789-91. Dr. Ovadia identified elevated blood pressure, but no signs of congested chest, no wheeze, no clicking sounds, and no peripheral edema. R. at 789-91. Dr. Ovadia prescribed medication changes to address Ms. Timms' symptoms and observation of recent negative arteriogram. R. at 789-91. On a June 11, 2007 follow-up visit, Dr. Ovadia noted Ms. Timms' onset of significant new chest pain and associated shortness of breath and mild nausea. R. at 765-66. Dr. Ovadia and Dr. Greenspan, who Dr. Ovadia referred, performed a series of tests on Ms. Timms' heart, with no new abnormalities except for mild diastolic relaxation. R. at 765-93. On June 13, 2007, Dr. Dombrowsi performed a gallbladder ultrasound, which showed findings of cholelitiasis. R. at 769. As a result, Ms. Timms had her gallbladder removed in July 2007. R. at 769. After her gallbladder removal, Ms. Timms' chest x-ray appeared normal. R. at 772.

Ms. Timms last had her hands evaluated in 1991. R. at 286. When she visited a military medical facility at that time, they indicated that she had numbness in both hands at night and the right hand had become permanently numb. R. at 286. However, the record lacks any recent EMG tests that would identify her condition at the time of her disability claim.

B. *State Agency Physician*

On January 10, 2005, Dr. Scott Kale performed an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services. R. at 215. Dr. Kale reviewed the treating physician records provided to him and noted Ms. Timms' sick sinus syndrome, heart block, pacemaker, asthma, hearing diminution, and knee discomfort. R. at 215. Based on his evaluation, Dr. Kale concluded that Ms. Timms suffered from three problems: (1) congenital deafness, corrected with hearing aids; (2) degenerative arthritis of her knees, without significant functional consequence; and (3) pacemaker secondary to cardiac dysfunction, with current functioning normal. R. at 218. Dr. Kale observed that Ms. Timms could understand his spoken voice with the use of hearing aids. R. at 217. Regarding her heart, Dr. Kale opined that Ms. Timms had regular rhythm, with no "rubs, clicks or murmurs," and that the pacemaker was well healed, with normal heart tones. R. at 217. Dr. Kale evaluated Ms. Timms' knees and musculoskeletal condition, noting that her knees had no

fluid or alteration of motion. R. at 217. Furthermore, Ms.
Timms exhibited a full range of motion of all joints, was capable
of bearing her own weight, had a normal gait, was able to
complete the heel-and-toe walk, and could ambulate 50 feet
without an assistive device. R. at 217. However, Dr. Kale
observed that Ms. Timms required the use of both hands to stand
from a sitting position due to her knee discomfort. R. at 217.

### ALJ Decision

The ALJ concluded that Ms. Timms was not disabled prior to
April 9, 2006, but became disabled on that date and continued to
be disabled through the date of the ALJ's decision. R. at 20.
First, the ALJ determined that Ms. Timms had not engaged in
substantial gainful activity since December 30, 2003, the
claimant's alleged disability onset date. R. at 21. Next, the
ALJ acknowledged that Ms. Timms suffered from the following
severe impairments: intermittent heart block; non-insulin
dependent diabetes mellitus; asthma; hearing loss; and
hypertension. R. at 22. However, the ALJ found that none of Ms.
Timms' impairments, or combination of impairments, met or
medically equaled one of the listed impairments under the Social
Security Regulations. R. at 22. The ALJ relied on the testimony
of the ME, Dr. Ronald A. Semerdjian, to assert that the
claimant's heart condition, diabetes, asthma, hearing loss, and

hypertension failed to meet or equal a listed level of severity. R. at 22-23.

As to Ms. Timms' residual functional capacity (RFC), the ALJ found that Ms. Timms remained capable of performing sedentary work, but was limited as follows: lifting 10 pounds frequently or 20 pounds occasionally; standing less than six hours in an eight-hour day, with the need to alternate between sitting and standing every 30 to 60 minutes; working in an environment free from loud background noise or frequent communication with coworkers or the public; and working in an environment free from pulmonary irritants. R. at 23.

The ALJ found Ms. Timms' statements "concerning the intensity, persistence and limiting effects of [her] symptoms . . . not entirely credible." R. at 27. The ALJ reasoned that, while Ms. Timms' determinable medical impairments could reasonably be expected to produce some of her alleged symptoms, the existence of any medical tests or objective findings was "grossly insufficient" to support many of her complaints and further limitations. R. at 27. The ALJ identified specific discrepancies between Ms. Timms' testimony that she could not sit for sustained periods of time and her ability to sit through both the first and second hearings— each lasting over an hour, with no apparent discomfort. R. at 27. Furthermore, the ALJ noted that Ms. Timms had been employed after her alleged onset date, which,

despite not qualifying as substantial gainful activity, indicated that her physical activities had, at times, been greater than reported. R. at 27-28.

The ALJ also gave limited weight to Ms. Timms' treating physician's opinion that she was unable to work. R. at 28. The ALJ relied on Dr. Semerdjian's opinion that the treating physician "provided no documented reasons and no bases in their [sic] treatment notes for those opinions." R. at 28. The ALJ further identified a discrepancy between Ms. Timms' alleged need to keep her legs elevated and the lack of any medical evidence of record showing a basis for elevating her extremities. R. at 28. The ALJ noted that the medical examination evidence provided only moderate support for Ms. Timms' alleged limitations, and that her physicians' continual recommendations for only conservative treatment of her symptoms conflicted with the limitations suggested by Ms. Timms' testimony. R. at 28.

In general, the ALJ found that the opinions expressed by Ms. Timms' various treating physicians were consistent with the ALJ's RFC findings. R. at 28. In the ALJ's opinion, the medical evidence of record indicated that Ms. Timms' treatment had been generally effective in controlling her symptoms. R. at 28. Furthermore, the ALJ afforded some weight to the State Agency physician opinion because the opinion was consistent with the prior record of treatment. R. at 28.

The ALJ adopted VE Newman's opinion that Ms. Timms could not perform any past relevant work. R. at 28. However, based on the VE's testimony, the ALJ found that, prior to April 9, 2006, a significant number of jobs existed in the national economy that Ms. Timms could perform. R. at 30. On April 9, 2006, Ms. Timms' age category changed from "younger individual" to "individual closely approaching advanced age." R. at 29. As a result of the change in age category, the ALJ found that Ms. Timms became "disabled" on April 9, 2006 under Medical-Vocational Rule 201.12, signifying that there no longer existed a significant number of jobs in the economy that she could perform. R. at 30.

The ALJ concluded that Ms. Timms was not disabled prior to April 9, 2006, but became disabled on that date and has continued to be disabled through the date of the ALJ's decision under sections 216(i) and 223(d) of the Social Security Act. R. at 30.

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ must "build an accurate and logical bridge from the

evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Should conflicting evidence permit reasonable minds to differ, it is the responsibility of the ALJ—not the courts—to determine if the claimant is disabled. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

While the ALJ need not address every piece of evidence in the record, she must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart*, 309 F.2d 424, 429 (7th Cir. 2002). Unless the ALJ fails to rationally articulate the grounds for her decision in a manner that permits meaningful review, the Court must affirm if there is substantial evidence supporting the ALJ's decision. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual seeking DIB must prove a disability under the SSA's five step inquiry. 20 C.F.R. § 404.1520. First, the ALJ establishes whether the individual is employed; second, the ALJ

determines if the individual has a severe impairment; third, the ALJ decides if the impairment meets or medically equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ ascertains the individual's RFC and whether she can perform her past relevant work; finally, the ALJ determines whether the individual is capable of performing work in the national economy.

## DISCUSSION

In support of her Motion for Summary Judgment, Ms. Timms argues that the ALJ failed to (1) properly consider the credibility of her testimony, (2) accord adequate weight to the opinion of Ms. Timms' treating physicians, and (3) consider whether Ms. Timms' impairments met or medically equaled a disability listing. Each of these arguments is considered in turn.

### I. The ALJ's Credibility Determination

Ms. Timms contends that the ALJ improperly rejected her testimony as not entirely credible. Ms. Timms challenges the ALJ's credibility determination for the first time in her reply brief. "Arguments that are raised for the first time in a reply brief are waived." *Damato v. Sullivan*, 945 F.2d 982, 989 (7th Cir. 1991). Therefore, Ms. Timms' contention about her

21

credibility need not be addressed. However, even if Ms. Timms had not waived this argument, the Court would uphold the ALJ's credibility findings.

An ALJ's credibility assessment is "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). An ALJ must weigh all credible evidence, but the law "does not compel an ALJ to accept wholly the claimant's perception of a disability." *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). The ALJ's determination will not be reversed "unless it is patently wrong." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). The Court does not review the medical evidence de novo, and will only declare the ALJ's determination patently wrong if it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Social Security Ruling 96-7p requires a credibility decision to "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (explaining that "a single, conclusory statement that 'the individual's

allegations have been considered' or that 'the allegations are (or are not) credible'" is insufficient).

The ALJ determined that Ms. Timms was not entirely credible with regard to the "intensity, persistence and limiting effects" of her symptoms. R. at 27. Ms. Timms testified to a variety of medical symptoms that affected her daily life. She stated that she has "bad pain" in her knees that prevent her from walking without a cane or another object as support. R. at 820. She claimed that she could stand for only 20 to 25 minutes at a time, and that she could not sit for more than 30 to 40 minutes without having to reposition herself. R. at 820-821. Ms. Timms stated that her diabetes and the treating medication cause her persistent headaches, nausea, sweating, drowsiness, and diarrhea three to four days per week. R. at 827-828. Ms. Timms described episodes where her pacemaker intermittently shocked her, causing pain and exhausting her. R. at 825-826. She stated that she cannot understand the majority of what other people say to her unless she is able to read their lips. R. at 818. Her hearing diminution and glaucoma have prevented her from obtaining a driver's license. R. at 829-830.

The ALJ based her credibility determination on several factors. First, the ALJ found that Ms. Timms' symptoms and limiting effects were not substantiated, stating that there were "grossly insufficient tests and objective findings" to support

many of her complaints and symptoms. R. at 27. The ALJ stated that the record of Ms. Timms' physical examinations provided only moderate support for her allegations, and that the course of treatment pursued by Ms. Timms' treating physicians is inconsistent with many of the limiting effects that Ms. Timms claimed. R. at 28. Conversely, the ALJ stated that the opinions in her treating physicians' reports generally support, and are consistent with, the RFC findings of the court. R. at 28. Specifically, the ALJ noted that nowhere in the volumes of medical evidence had there been any indication or recommendation that Ms. Timms elevate her extremities while sitting. R. at 28.

Ms. Timms argues that the ALJ's assessment of her credibility was merely boilerplate and insufficient regarding the requirements of SSR 96-7P. Pls. Reply Br. at 7. Citing *Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007), Ms. Timms asserts that the ALJ did not justify or explain her credibility determinations. Pls. Reply Br. at 7. In *Giles*, the Seventh Circuit stated that the ALJ had not made an effectual credibility determination where the ALJ concluded that the claimant was not fully credible, and merely recited portions of the claimant's testimony. 483 F.3d at 488. Instead, an ALJ must explain the basis of her credibility assessment. *Id.*

Contrary to *Giles*, here the ALJ met the requirements for her credibility determination by explaining the basis for her

24

determination and the inconsistencies she identified. As referenced above, the ALJ found that the record did not support Ms. Timms' assertion that she needed to keep her legs elevated while sitting. R. at 27. In regards to Ms. Timms' claim that she was unable to sit for more than 30 to 40 minutes without repositioning herself or elevating her legs, the ALJ observed that Ms. Timms was able to sit through both her first and second hearings before the ALJ, each lasting over an hour, "without exhibiting any signs of discomfort." R. at 27. The ALJ noted that this observation was not conclusive of Ms. Timms' ability to sit, but was relevant to the ALJ's determination. R. at 27. The ALJ further found that Ms. Timms had engaged in work activity subsequent to her alleged onset date. R. at 27. That work activity was not disqualifying substantial gainful activity, but suggested to the ALJ that Ms. Timms' "daily activities have, at least at times, been somewhat greater than the claimant has generally reported." R. at 27-28.

In addition, the ALJ recognized that Ms. Timms' 2004 heart surgery would normally weigh in favor of her symptoms, and certainly supports that some of Ms. Timms' complaints were genuine. R. at 28. However, the ALJ stated that the record reflects that the heart operation was successful. R. at 28. Moreover, the ALJ noted that Ms. Timms' follow-up treatment suggests that the pacemaker is effectively relieving her

symptoms, which negates the weight of some of Ms. Timms'
cardiovascular symptom complaints. R. at 28. The ALJ also found
that the list of medications Ms. Timms was taking did not suggest
that she had any impairment that was more limiting than those
found in the ALJ's RFC finding. R. at 27. As to Ms. Timms'
hearing deficiency, the ALJ commented that Ms. Timms owns hearing
aids, but failed to wear them to both of her court hearings. R.
at 24.

Ms. Timms further argues that neither the ALJ nor Dr.
Semerdjian stated what additional testing or documentation should
have been presented at the hearing. Pls. Reply Br. at 6. SSR
96-7P does not require the ALJ to suggest what additional
evidence could have been provided; the regulation merely requires
the ALJ to provide a basis, supported by the evidence of record
for her determination. 1996 WL 374186, at *4 (July 2, 1996).
The ALJ met this burden by identifying the inconsistencies
between Ms. Timms' testimony and the objective evidence noted
above. Furthermore, the ALJ clarified the objective evidence
that was lacking. Specifically, the ALJ noted that, despite Ms.
Timms' complaints about her hands bothering her, she had not had
any EMG tests for carpal tunnel completed since 2000, and she was
not using any curative devices like wrist braces. R. at 25. The
ALJ also noted that Ms. Timms has had no back tests since April
2000. R. at 25. The ALJ found that, despite Ms. Timms'

arthroscopy knee operation on September 6, 2005, and continued knee complaints, she made no follow-up visits for her knee impairments after the date of the surgery. R. at 25.

The Court upholds the ALJ's credibility determination. Although the ALJ's opinions based on the evidence of record may be debatable, there is nothing of record to suggest her opinion is patently wrong. *Elder*, 529 F.3d at 413 (a reviewing court's role is merely to "examine whether the ALJ's determination was reasoned and supported"). Thus, the ALJ's finding on Ms. Timms' credibility deserves substantial deference, and is upheld by the Court.

## II. *The ALJ's Consideration of Opinion Evidence*

Ms. Timms argues that the ALJ improperly accorded inadequate weight to the opinions of her three treating doctors—Dr. Ebert, Dr. Muzaffam, and Dr. Ovadia. A treating physician's "opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (more weight is given to the treating physician's opinion because of his familiarity with the patient). However, Ms. Timms is not entitled to disability benefits simply because her

physician states that she is "disabled" or "unable to work." *Id.*

On August 8, 2004, Dr. Ebert wrote that Ms. Timms had "multiple significant health problems limiting her from working at this time." R. at 207. Dr. Ebert opined that Ms. Timms had been unable to work for the past four to six months, and would be unable to work for the following six months, because of her severe irregular heartbeat, for which she has a pacemaker; her arthritic knees that limit her ability to stand or walk; her respiratory problems that cause shortness of breath; and her severe hearing loss. R. at 207. On October 22, 2004, Dr. Ebert reiterated his opinion in his response to the Illinois Department of Human Services, stating that Ms. Timms was unable to work at that time as she was "very limited" by her heart problems, knee arthritis, and hearing deficiency. R. at 204.

On October 8, 2004, Dr. Muzaffam responded to the State's inquiry regarding Ms. Timms' limiting conditions. R. at 210-14. Dr. Muzaffam reported that Ms. Timms suffered from sick sinus syndrome and A-V Block, that she had a pacemaker, and that she had asthmatic attacks two to three times per week. R. at 212. However, Dr. Muzaffam also noted that Ms. Timms' breathing was normal, her most recent chest x-ray was normal, and she was having a "fair" response to her current prescribed treatments. R. at 212. Dr. Muzaffam found that Ms. Timms became short of

breath after a half block, but that she was capable of performing "light physical activity."  R. at 212.

Ms. Timms' allegation also alludes to the opinions of a third treating physician, Dr. Ovadia.  Pls. Reply Br. at 3. However, as the Commissioner's Reply Brief points out, there is no evidence of record where Dr. Ovadia provides an opinion on Ms. Timms' physical capabilities.  Dr. Ovadia did see Ms. Timms on October 20, 2004 for a cardiac consultation.  R. at 697.  At that time, Dr. Ovadia concluded that Ms. Timms' sick sinus syndrome was of the bradycardia-tachycardia variant, and that she had shortness of breath consistent with her "pacemaker's documented tracing of the atrial arrhythmia."  R. at 697.  Dr. Ovadia made note of Ms. Timms' asthma and partial deafness, and suggested continued conservative treatment of prescribed medication for her symptoms, but did not comment on her physical capabilities.  R. at 697-98.

Ms. Timms argues that the ALJ failed to "minimally articulate" the weight given to her treating physicians' opinions or the reasons for discrediting the treating physicians' opinions.  *See Clifford*, 227 F.3d at 870.  Ms. Timms contends that the ALJ did not give "any credence whatsoever to the treating physician's statements," and that the ALJ did not articulate the "medical, clinical [or] laboratory diagnostic techniques [or] the other evidence presented," that would

discredit the treating physicians' opinions. Pls. Reply Br. at 3-4. Furthermore, Ms. Timms argues that the ALJ provided an incomplete record of the medical findings, and thus improperly discussed only the evidence that favored her decision. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion.").

Contrary to Ms. Timms' perspective, the ALJ did not discount or discredit the weight of the treating physicians' medical opinions. Rather, the ALJ accepted the medical opinions of Drs. Ebert, Muzzafam, and Ovadia, finding that their opinions "generally indicate[d] limitations that [were] consistent with the residual functional capacity findings reached in this decision." R. at 28. The only opinion that was not accepted by the ALJ was Dr. Ebert's assertion on October 8, 2004, and again on October 22, 2004, that Ms. Timms was unable to work. R. at 28. The ALJ is not required to give controlling weight to a treating physicians' conclusion of disability or inability to work; those conclusions are ultimately left to the Commissioner. *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010); 20 C.F.R. § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Likewise, an ALJ does "not

give any special significance to the source of an opinion on issues reserved to the Commissioner," such as the ultimate determination whether the claimant is disabled. 20 C.F.R. § 404.1527(e)(3). Furthermore, the Court must be wary of treating physicians' potential biases that may encourage them to find a disability too quickly. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

The ALJ acknowledged Dr. Ebert's conclusion that Ms. Timms could not work because of her heart problem, arthritic knees, asthma, and hearing disability. R. at 25. However, the ALJ agreed with Dr. Semerdjian, finding that "there are no documented reasons and no bases in their [sic] treatment notes for those opinions." R. at 28. The ALJ stated that Ms. Timms' record of physical examinations provided, "at best, only moderate support" for her limitations. R. at 28. The ALJ further reasoned that the courses of treatment recommended by her treating physicians indicated limitations that were consistent with the RFC finding, and that Ms. Timms' treatments had been "generally . . . successful in controlling [her] symptoms." R. at 28. In addition, the ALJ noted that some weight was given to the State Agency opinions of Dr. Scott Kale, particularly because Dr. Kale's findings were "not inconsistent with the record of treatment." R. at 28. The ALJ appropriately considered the sum of medical evidence on record relating to the four limitations

mentioned by Dr. Ebert, and the ALJ conditioned Ms. Timms' RFC finding accordingly.

Relating to Ms. Timms' heart problem, the ALJ reviewed the continued treatment of her third-degree heart block and sick sinus syndrome. R. at 25-26. The ALJ noted that, despite Ms. Timms' complaints, the record reflected that the pacemaker implanted in June 2004 had been alleviating her previous symptoms. R. at 28. The ALJ acknowledged Dr. Ovadia's cardiac consultation with Ms. Timms after she received her pacemaker, who recommended only continuation of conservative prescribed medication treatment. R. at 26. Furthermore, the ALJ considered Dr. Kale's State Agency opinion that Ms. Timms exhibited regular heart rhythm and tones at her January 2005 consultative internal medicine examination. R. at 26.

The ALJ also discussed Ms. Timms' history of conservative treatment for asthma and chest pain, with shortness of breath. R. at 25. As of June 2004, Dr. Ebert reported that Ms. Timms was experiencing asthmatic attacks two to six times per month, whereas Dr. Muzaffam reported attack frequency at twice per week. R. at 26, 204. Dr. Ebert considered this as part of his conclusion that Ms. Timms could not work, while Dr. Muzaffam opined that Ms. Timms was limited to "light physical activity." R. at 26. The ALJ further noted Dr. Muzzafam's finding that Ms. Timms was having "fair" response to the asthma treatment. R. at

32

26.  Based on Dr. Muzaffam's opinion that Ms. Timms could perform
light physical activity and Ms. Timms' own testimony that she
could lift twenty pounds three to four times, the ALJ restricted
her RFC to lifting twenty pounds occasionally and ten pounds
frequently.  R. at 23.  Additionally, Ms. Timms' RFC required her
environment be free from pulmonary irritants because of her
asthma.  R. at 23.

The ALJ reviewed the evaluations of Ms. Timms' knees. The
ALJ found that the medical records provided no explanation as to
why Ms. Timms should elevate her knees on a regular basis.  R. at
28.  The ALJ also acknowledged the January 2005 findings of the
State Agency medical examination by Dr. Kale, who noted that Ms.
Timms could ambulate fifty feet without assistance, and had a
normal gait.  R. at 26.  The ALJ noted Ms. Timms' September 6,
2005 arthroscopic knee operation, and also commented that Ms.
Timms sought no further medical consultations for her knee after
that time.  R. at 26.  Based on the consistent acknowledgment of
Ms. Timms' arthritic knees, and her own testimony that she could
stand for only twenty to twenty-five minutes, the ALJ's RFC
included a sit-stand option.  R. at 23.

The ALJ addressed each of the treating physicians' notation
of Ms. Timms' hearing deficiency.  R. at 25-27.  The ALJ noted
that Ms. Timms' last available audiogram was "ancient."  R. at
22.  The ALJ further acknowledged that Ms. Timms owned hearing

33

aids, but that the record did not contain any evidence evaluating her functioning with her hearing aids. R. at 22, 25. Due to Ms. Timms' partial deafness, her RFC required her environment to be free from background noise or frequent communication. R. at 23.

The Court upholds the ALJ's determination that Dr. Ebert's opinion that Ms. Timms could not work did not deserve controlling weight. The ALJ provided several limitations for Ms. Timms' RFC based on the medical evidence and opinions of record. R. at 23. Dr. Ebert's opinion that Ms. Timms could not work was outside of his province, and therefore, was properly discredited by the ALJ. The ALJ credited the sum of medical evidence of record and incorporated that evidence into Ms. Timms' RFC finding. As such, the Court rejects the Plaintiff's claim in this regard.

### III. The ALJ's Medical Findings

Ms. Timms argues that the ALJ erred by not considering: (1) other severe impairments; (2) whether the combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (3) additional factors that diminish Ms. Timms' ability to perform a limited range of sedentary work.

The ALJ must consider all credible medical evidence, but may discount medical evidence if there is a specific or legitimate reason for rejecting it, such as inconsistency with the other

evidence in the record. *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

## A. Other Severe Impairments

Ms. Timms argues that the ALJ erred by not classifying the following as severe impairments: (1) her deficient hearing; (2) her musculoskeletal system; and (3) her heart condition.

First, Ms. Timms argues that the ALJ failed to consider her hearing deficiency as a severe impairment. The ALJ found that the claimant suffered from hearing loss, but that neither Ms. Timms' average hearing threshold sensitivity, nor her speech discrimination ability satisfied the severity requirements. R. at 23. Furthermore, the ALJ noted that no other evidence was offered that would indicate the necessary severity. R. at 23. Ms. Timms argues that her hearing impairment should be evaluated by her ability to hear and distinguish speech, and that she "had an inability to hear speech without a hearing aid, and even with a hearing aid was only able to determine what was said by looking directly at the speaker and lip reading." Pls. Reply. Br. at 7. The ALJ did not deny Ms. Timms' hearing loss; however, the ALJ noted that Ms. Timms had been prescribed hearing aids, and that no tests had been provided as evidence to show Ms. Timms' functioning with her aids. R. at 22. Furthermore, the ALJ observed that Ms. Timms failed to wear her hearing aids to either

of her appearances before the ALJ.  R. at 24.  In addition, this determination by the ALJ was consistent with her credibility determination, and her RFC findings that the work environment be free from background noise.

Next, Ms. Timms argues that the ALJ neglected to consider her musculoskeltal system impairments as severe.  To support her contention, Ms. Timms asserts that she is unable to ambulate effectively, and must use a cane or a wall for support when walking.  As the ALJ noted, the State Agency medical opinions deserved weight in this case for their consistency with other evidence of record.  The ALJ referenced Dr. Kale's findings that, after claimant's January 10, 2005 visit, Ms. Timms had a normal gait, and could ambulate fifty feet without assistance.  R. at 26.  The ALJ did not deny Ms. Timms' knee discomfort, but, as previously discussed, the ALJ properly found that the claimant's testimony about the intensity, persistence, and limiting effects of her pain was not entirely credible.

Finally, Ms. Timms argues that the ALJ improperly failed to consider Ms. Timms' heart condition as severe.  Ms. Timms does not cite any specific medical evidence for this argument, but asserts that the documentation throughout the entire record indicates she meets the severity requirement.  Ms. Timms does reference Dr. Semerdjian's statement that her pacemaker was working effectively, but that her heart is not normal.  The ALJ

appropriately stated in her opinion that Ms. Timms' heart condition fails to meet any severity listing, because there is no evidence of recurrent arrhythmias, uncontrolled episodes of cardiac syncope or near syncope document by electrocardiographs. R. at 22. The ALJ further stated that claimant's hypertension lacked the significant end organ damage or other abnormalities required for the severity finding. R. at 23. In addition, Dr. Semerdjian considered the sum of medical evidence and stated that Ms. Timms' pacemaker was operating correctly.

Because the ALJ "analyzed the correct criteria and relied on appropriate medical evidence," the ALJ's decision is properly supported by substantial evidence. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447-48 (7th Cir. 2004).

*B. Whether Impairments Meet or Medically Equal a Listed Impairment*

Ms. Timms argues that the ALJ erred by not considering whether her impairments met or medically equaled any of the listed impairments. Ms. Timms states that "the ALJ completely fail[ed] to even consider whether she meets or equals a listing." Pls. Reply Br. at 8.
Contrary to Ms. Timms' contention, the ALJ properly considered the lot of Ms. Timms' impairments. The ALJ specifically discussed her severity findings in the context of the listed

impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1, for the claimant's heart condition, diabetes, asthma, hearing loss, hypertension and knee arthritis. R. at 22-23, 27-28.

The ALJ properly relied upon Dr. Semerdjian's conclusion that none of Ms. Timms' impairments, nor the combination of her impairments, met or medically equaled a severity listing. Determining whether an impairment equals a severity listing is a medical judgment, and the ALJ must consider an expert's opinion. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). At Step 4 of her analysis, the ALJ stated the following:

> Dr. Ronad [sic] A. Semerdjian, a board-certified internist, testified that the severity of claimant's conditions neither meets nor equals any of the listed impairments. Based on Dr. Semerdjian's expertise, knowledge, and experience in evaluating medical evidence within the Social Security disability program, the undersigned finds the claimant's condition are not of listing level severity. . . . Nor are there additional finding that can be relevantly substituted for those which the listing sections require but are missing.

R. at 22-23. Therefore, the ALJ properly considered a medical expert's opinion to determine whether Ms. Timms' impairments met an impairment listed by the Commissioner.


*C. Additional Factors Affecting Ms. Timms' Ability to Work*

Ms. Timms asserts that the ALJ failed to consider additional factors that limited her ability to perform a full range of sedentary work. Specifically, Ms. Timms claims that her need to

alternate between sitting and standing, and her weak hands
diminished her ability to perform either of the jobs proffered by
VE Newman.

First, Ms. Timms argues that there is no indication in the
record that the two jobs referenced by the VE would permit Ms.
Timms a sit-stand option. Ms. Timms references SSR 83-12,
stating that "[u]nskilled types of jobs are particularly
structured so that a person cannot ordinarily sit or stand at
will." However, Ms. Timms fails to consider the following
statement in SSR 83-12, that "[i]n cases of unusual limitation of
ability to sit or stand, a VS ["Vocational Specialist"] should be
consulted to clarify the implications for the occupational base."
Under SSR 83-12, "VS" refers to "all vocational resource
personnel." Accordingly, the ALJ properly considered and relied
upon the testimony of the VE, who identified two sedentary
positions that would accommodate Ms. Timms' sit-stand option.

Ms. Timms argues that her problems with her hands would make
it "unlikely that she possessed the finger dexterity" to perform
the assembler button and notion job. Here, Ms. Timms presents a
skeletal argument and proffers no evidence that she lacked finger
dexterity. However, the ALJ noted that Ms. Timms' hands were
last evaluated for carpal tunnel syndrome in 1991, and that no
objective medical evidence supported a finding of disability or
RFC limitation for the period in question.

Finally, Ms. Timms argues that "it seems hard to believe" that there were 43,881 bench assembly jobs, or 12,840 nut sorter jobs in the local economy. Ms. Timms stipulated to the VE's qualifications as a vocational expert at her hearing. Her mere belief that the number of jobs listed by the VE is incorrect will not be considered.

The Court finds that the ALJ correctly determined that substantial evidence did not support the additional limitations put forth by Ms. Timms.

## CONCLUSION

For the reasons set forth above, the ALJ's denial of Ms. Timms' application for DIB for the period prior to April 9, 2006 is supported by substantial evidence. The Court denies Ms. Timms' Motion for Summary Judgment, and grants the Commissioner's Motion for Summary Judgment.

Dated: November 23, 2010     E N T E R:

_____
ARLANDER KEYS
United States Magistrate Judge